AO 91 (Rev. 11/11)   Criminal Complaint



# UNITED STATES DISTRICT COURT

FILED
-4 2019

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

*JCS*

for the

Northern District of California

| United States of America | ) | |
| v. | ) | Case No.   3 19 71455 |
| Scott Taylor, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT ~~UNDER SEAL~~

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  ___September 28, 2017___  in the county of  ___San Francisco___  in the
___Northern___ District of  ___California___ , the defendant(s) violated:

| Code Section | Offense Description |
| --- | --- |
| 42 U.S.C. § 1320a-7b(b) | Criminal penalties for acts involving Federal health care "Anti-Kickback Statute." |

This criminal complaint is based on these facts:

Please see attached affidavit.

☑ Continued on the attached sheet.

Approved as to form:

_____
WILLIAM FRENTZEN
Assistant United States Attorney

_____
*Complainant's signature*

Janette Spring, Special Agent - FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  ___9/3/19___

_____
*Judge's signature*

City and state:  ___San Francisco, California___

Hon. Joseph C. Spero, U.S. Chief Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Janette Spring, Special Agent with the Federal Bureau of Investigation ("FBI") being first duly sworn, hereby depose and state as follows:

## I.   INTRODUCTION

### A.   SYNOPSIS

1.   I submit this affidavit in support of a criminal Complaint for Dr. Scott TAYLOR ("TAYLOR").

2.   There is probable cause to believe TAYLOR engaged in a scheme to commit Medicare fraud by receiving kickback payments in exchange for the referral of home health and/or hospice patients in violation of 42 U.S.C. § 1320a-7b(b), the anti-kickback statute.

3.   As part of this investigation, the Agents have obtained information from the cooperation of an FBI confidential witness ("CW-1")[1] and evidence obtained by an FBI undercover employee ("UCE"):

4.   An identified co-conspirator introduced TAYLOR as a physician willing to accept kickbacks in exchange for patient referrals.

---

[1] CW-1 has provided information and services to the FBI over approximately two years and has received no monetary compensation or other consideration from the FBI in exchange for the information and services. However, CW-1 was employed by a home health care agency ("HHA Alpha"), which served as a cooperating entity supporting the FBI's undercover operation. As a result of the undercover operation, patient numbers and/or revenue to CW-1 and CW-1's HHA may have increased. These potential increases to CW-1's HHA may have provided benefit to CW-1 by improving his/her standing with the employing HHA. A criminal background check of CW-1 revealed convictions for embezzlement, grand theft, and an arrest for false claim to citizenship. CW-1 is an undocumented immigrant who entered the United States illegally and by presenting false identifying documents to a CBP officer. The CW-1 later falsely denied having possessed false identifying documents when interviewed by immigration officers. Although CW-1 is a removable alien, removal has been deferred under the Convention Against Torture. The CW-1 may have an incentive to curry favor with federal law enforcement because of his immigration status. After the conclusion of this undercover operation, FBI Agents became aware that during the undercover operation but after HHA Alpha was no longer accepting patient referrals from targets of the investigation, CW-1 was believed to have tried to use his/her role as a source to threaten an individual – with whom he/she had a personal dispute – with a law enforcement investigation into the practices of this individual. To my knowledge, those threats were never carried out. CW-1 is not currently the subject of any pending criminal charges.

5.      During the course of the investigation, the UCE had in-person audio and video recorded conversations with TAYLOR in 2017, in which TAYLOR received kickback payments in the form of cash in exchange for the referral of patients.

**B.      BACKGROUND OF LEGAL FRAMEWORK AND INVESTIGATION**

6.      Starting in the 1970s, Congress created, amended, and strengthened the "Anti-Kickback Act", currently United State Code, Title 42, Section 1320a-7b(b). The relevant language of the statute is listed below. In essence, the law criminalizes influencing referrals for federally funded health care through payments. The legislative history revealed Congress was deeply concerned the normalization of kickbacks in federally funded health care programs would lead to fraud and an undermining of the quality of patient services since "operators become more concerned with rebates than with care.[2]" FBI Agents began looking into kickbacks in the San Francisco Bay Area, specifically in the fields of home health and hospice. Their investigation arose from concerns of false billing, referrals without patient care in mind, that health care providers would have a willingness to expose their patients to unnecessary treatments and that certain home health agencies ("HHAs") would have a willingness to bill for, but not provide, necessary services.  The preliminary investigation into kickbacks occurring in the Bay Area in the fields of home health and hospice revealed that the above concerns were indeed occurring. Some of the most egregious examples uncovered by the investigation included doctors who referred patients to hospice care in exchange for kickbacks while demanding a "longevity" bonus – meaning the doctor would financially benefit the longer a patient remained on hospice. Since hospice is generally meant for palliative care without curative intent, this system could encourage doctors to abandon curative options earlier with potentially life threatening outcomes.[3]

---

[2] "Kickbacks Among Medicaid Providers", Senate Report 95-320, 1977.

[3] In fact, throughout the course of the investigation, four of the targets, while negotiating kickback payment amounts, discussed similar "longevity" bonuses. UCE agreed to these bonuses or entertained further discussion to potentially identify any such referrals by proactively identifying at-risk patients. During the course of the investigation, no such longevity bonus referrals were made to the UCO.

7.     An undercover operation was selected as the means of investigating kickbacks. From training and experience, the investigators understood that health care providers and HHAs shrouded their activities in secrecy. Typically, health care providers were given kickbacks in the form of cash payments made in closed door meetings between themselves and HHA representatives. Some used bogus medical directorship/consultant contracts to disguise kickbacks as payments for seemingly legitimate, but actually non-existent, services. Given the expected closed nature of the transactions and the relatively traceless nature of cash payments, traditional documentary and other overt investigative techniques were deemed to be ineffective. An undercover operation ("UCO") was considered as the most efficient and most successful means to gather direct evidence of the payments and the corrupt intent of the kickback payments.

8.     Around July 2016, two employees of a known Bay Area home health agency ("HHA Alpha") made a complaint to Health and Human Services Office of Inspector General ("HHS-OIG") regarding payments of kickbacks to doctors by other HHAs in the Bay Area. One of the two agreed to serve as a cooperating witness ("CW-1"). CW-1 was paired with an undercover FBI agent ("UCE"), based in San Francisco, who would portray himself/herself as someone representing investors, intent on acquiring HHA Alpha and seeking to expand HHA Alpha's patient population through illegal kickbacks. UCE often communicated with targets in furtherance of the UCO while in San Francisco. The UCO sought to investigate predicated targets and to use predicated targets to refer UCE to other violators who the targets believed to be engaged in similar conduct.

9.     In designing the UCO, investigators learned health care providers were weary of potential legal risks that caused them to be unwilling to accept kickbacks from an unknown undercover agent without an introduction from a known member of the industry. Further, the nature and size of the kickbacks were dependent on the types of HHA services required. For example, certain types of insurance and services were reimbursed at a higher rate, which in turn would lead to higher kickbacks. Many health care providers were also quite concerned with patient satisfaction, partially to avoid a disgruntled patient from questioning the corrupt HHA referral. Therefore, the ability to provide specific details about services, accepted insurance plans, and patient satisfaction was critical to both gaining the initial

3

introductions and to allowing the UCO to expand. The involvement of a vetted HHA would facilitate entry of the UCO and allow kickback referrals to be diverted away from predicated HHA companies. Further, the care provided by the vetted HHA could be monitored and reviewed.

10.     In keeping with those goals, HHA Alpha effectively served as a cooperating entity through its management and its participation in the UCO. The FBI investigation was partly based upon analysis of so-called outlier data – data showing abnormal and potentially illegal conduct – among HHAs and doctors as well as through interviews. Based on examination of the data and interviews, HHA Alpha did not fall into the profile of a likely kickback offender. Checks of FBI databases did not reveal HHA Alpha as a prior or current subject of any investigations. Additionally, the FBI consulted with HHS-OIG and determined HHA Alpha was not a prior or current subject of any investigations. From the founding of HHA Alpha in 2009 until the initiation of the UCO, Medicare received two complaints[4], which were later deemed to be unsubstantiated. Additionally, HHA Alpha's owner was aware that CW-1 would be cooperating with an investigation and the patient paperwork and referrals to HHA Alpha during the UCO were required to be brought to the attention of the investigating agency. Patients referred to HHA Alpha by physicians and others receiving payment from FBI through the UCO, (1) were contacted by an employee of HHA Alpha to obtain their consent for treatment by HHA Alpha, (2) as a result of this consent and intake process, some patients ultimately did not receive treatment from HHA Alpha because they declined treatment, preferred an HHA of their own choosing, or medical evaluation determined treatment was inappropriate, (3) HHA Alpha was made aware of patients that were referred through the course of the UCO, and (4) FBI conducted interviews of all available patients referred to HHA Alpha and there were no serious allegations of failure in patient care.[5] During the course of the UCO, there was one

---

[4] An anonymous complaint filed in 2016 alleged a durable medical equipment kickback scheme, which was closed due to insufficient information. In 2015, Medicare closed a patient allegation of false billing by HHA Alpha after a review of documents provided by HHA Alpha justified the billing.

[5] Only three patients out of 129 interviewed by FBI complained and the complaints consisted of (1) early discontinuation of treatment, (2) a nurse should have shown up more often, and (3) physical therapy should have been longer. Of all patients referred to HHA Alpha by targets of the investigation during the UCO, the FBI was unable to interview 31 patients due to the patients passing away in hospice care or because the patients could not be located – generally international patients. As to those patients, no complaints regarding patient care were ever filed against HHA Alpha.

complaint regarding patient care provided by HHA Alpha made by a recently hired, and then fired employee, but an investigation by the California Department of Public Health did not result in any negative finding against HHA Alpha. No other complaints about HHA Alpha were reported to Medicare through the duration of the UCO. During the course of the UCO, a total of 27 subjects were paid kickbacks and referred patients to HHA Alpha. At no time during their meetings with CW-1 and/or UCE did the subjects express any concerns regarding the treatment of their patients by HHA Alpha nor notify that any patient complaints had been received. Further, none of the subjects indicated they were aware of any illicit conduct by HHA Alpha prior to or during the UCO.

### C. AGENT QUALIFICATIONS

11.    I am a Special Agent of the FBI and have been so employed for approximately three years. I am currently assigned to the Complex Financial Crime Squad of FBI's San Francisco Field Division. As part of my assigned duties, I investigate possible violations of federal criminal law, specifically investigations involving white collar crime. I have received specialized training in health care fraud matters including, but not limited to, Anti-Kickback, Mail Fraud, Wire Fraud, and False Claims. I have participated in the execution of various arrests and search warrants in which business and personal documents, bank records, computers, and other evidence of fraud and other crimes have been seized.

12.    In the course of this investigation and my investigation of other health care fraud schemes, I have (1) interviewed numerous persons; (2) reviewed numerous records and pertinent data; (3) read interviews and other reports written by other law enforcement officers; and (4) become familiar with the manner and means by which health care fraud schemes are operated including violations of 42 U.S.C. Section 1320a-7b and 18 U.S.C. Section 371.

13.    This affidavit is intended to show merely that there is sufficient probable cause for the requested Complaint and arrest warrant and does not set forth all of my knowledge about this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.  Where excerpts of transcripts of audio recorded conversations are presented, they represent my best effort at this time to transcribe such recordings and I believe them to be accurate in substance.

### D. COMPLAINANT

14.     Dr. Scott TAYLOR, is a 61 year old physician operating a medical office in Oakland, CA. During the course of the investigation, TAYLOR accepted $4,000 in kickbacks from an FBI UCE in exchange for patient referrals.

### E. STATUES VIOLATED

15.     **Title 42, United States Code, Section 1320a-7b(b)(1)(A)**, in relevant part, makes it a crime for any person to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directory or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

## II.     PROBABLE CAUSE

### A.     TAYLOR IS INTRODUCED TO THE UCE BY A CO-CONSPIRATOR

16.      In January 2017, CW-1 identified GLENNDA SANTOS ("SANTOS") as a prominent marketer employed by several HHAs in the area.

17.     CW-1 informed agents that SANTOS was participating in a cash-for-patient referral scheme involving physicians, hospital case managers, and employees at skilled nursing facilities throughout the San Francisco Bay Area.  In so doing, SANTOS would give envelopes of cash to these individuals in order to direct patient referrals to the HHAs.

18.     TAYLOR was later introduced to the UCE by a co-conspirator, Dr. Henry WATSON ("WATSON"), a physician introduced into the scheme by SANTOS.

19.     During the course of the UCO, between April 2017 and September 2017, the UCE met with WATSON on several occasions. During their recorded meetings, WATSON accepted kickbacks in exchange for patient referrals to HHA Alpha. WATSON also offered to introduce the UCE to other physicians willing to engage in the kickback scheme.

20. During a meeting on June 29, 2017, WATSON identified TAYLOR as a physician willing to engage in the scheme. WATSON instructed the UCE as how to approach TAYLOR and the other physicians, suggesting the UCE mention WATSON's name and use "code words". In suggesting the use of "code words", WATSON demonstrated he was aware of the illicit nature of his relationship with the UCE and was attempting to conceal the illicit activity. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| WATSON: | You might use some kind of terms like ah Dr. Watson you know says he works you know worked very closely with you and we've he's sent us some patients ah he understand he was saying that you're very much entrepreneur and in the entrepreneurial spirit of business my time is a really good opportunity. Something like that. |
| UCE: | Sure. |
| WATSON: | You know, you know all the code words. |
| WATSON: | … |
| UCE: | . . . I don't generally say stuff like I've got reasons for you to meet me. |
| WATSON: | Yeah, that's . . . |
| UCE: | Thousands of reason to meet me. |
| WATSON: | Yeah, there there you go. |
| UCE: | (laughs) |
| WATSON: | There you go.  That's real cuts right to the chase. |

21. On September 19, 2017, the UCE recorded a meeting with WATSON, during which they discussed the UCE's unsuccessful attempts to contact the physicians identified by WATSON. During their meeting, WATSON placed a phone call to TAYLOR in order to introduce TAYLOR to the UCE. When TAYLOR did not answer the call, WATSON left a voicemail message introducing the UCE as an individual who had "something that would put a smile on your [TAYLOR] face" and suggested TAYLOR take the opportunity to meet with the UCE.

22. Immediately following the meeting with WATSON, the UCE sent TAYLOR an introductory text message, stating "My name is [the UCE], Dr. Watson just texted you about a good

7

business opportunity you may like. Do you have free time tomorrow midday?" TAYLOR advised he was out of town on travel but offered to meet on September 28, 2017, stating "Thursday at Lunch - Tentative Let's Talk Thursday AM to make sure."

**B.      TAYLOR ACCEPTS KICKBACKS PAYMENTS IN EXCHANGE FOR THE REFERRAL OF MEDICARE PATIENTS**

23.      During a recorded meeting with TAYLOR at his medical office in Oakland, CA on September 28, 2017, the UCE explained his/her involvement the takeover of HHA Alpha and that s/he had adopted "aggressive business practices" [the payment of kickbacks] in order to increase HHA Alpha's patient population. The UCE further explained s/he had a "trusting relationship" with WATSON and was relying on WATSON to introduce other physicians interested in a similar arrangement. TAYLOR indicated understood the arrangement would benefit him financially, referencing the need for people "supplement their income". Below is an excerpt of the aforementioned exchange:

> UCE:      Um but in the meantime we've realized that um we have not really established close trusting relationships with doctors.  We're looking to adopt a little bit more aggressive business practices that where both sides see you know return on the relationship.
>
> TAYLOR:      Right.
>
> UCE:      Uh and so Doctor Watson thought that you might be interested in such a relationship if I ho-ho-hopefully that's not a shock.
>
> TAYLOR:      ...medicine the way it used to be the way it's now are two different things now they're-they're cutting back on everything so people have to look different places, supplement their income...

24.      TAYLOR demonstrated his understanding that "aggressive business practices" was, in actuality, reference to the payment of kickbacks by indicating such practices would allow for an individual to "pay your rent". Below is an excerpt of the aforementioned exchange:

> UCE:      Um so I-I-I-I know you as a surgeon you know uh you know you're not in this just for uh the aggressive business practice you wanna make sure people taken care of.
>
> TAYLOR:      Right but you also have to pay your rent, pay your house...

25.     The UCE expressed the importance of building a referral base slowly as they did not want to draw attention to their illicit arrangement. Below is an excerpt of the aforementioned exchange:

UCE:         Um too aggressive and so you know I'm obviously none of these little side endeavors are worth your license or my you know.

TAYLOR:     Right, right.

UCE:         You know any sort of uh anyone looking into to it would be uncomfortable.

26.     The UCE then discussed the type of patient that could be expected in exchange for the kickback payment. The UCE stressed the importance of minimizing red flags by avoiding exclusive relationships with physicians and only accepting Medicare patients. The UCE offered to accept patients from a variety of insurance providers, explaining reimbursement rates for Medicare patients would off-set the lower reimbursement rates of other insurance providers. Below is an excerpt of the aforementioned exchange:

UCE:         Well, that's something. Well basically we have to mix it up so basically what we do is we understand that there's gonna be those patients that need the care and it's just they have a...unfortunate PRO or whatever policy. But if we can mix in medicare with those then we make up some money with others we try to take care of everybody but you know so, we'll tell you in advance if it's absolutely something that we can't do but we do take a mixture, I can get you the entire list but we don't want ...again, to avoid any red flags, we don't want anything that looks exclusive, we don't anything that's entirely one class of patient. Even though it might pay better...we do understand that it has to be played carefully.

TAYLOR:     Alright.

UCE:         With that, would you...um...does this sound like something that would be okay with you?

TAYLOR:     Yeah, it sounds fine.

27.     As part of their arrangement, the UCE offered TAYLOR $1,000 as a sign-on bonus and another $1,000 for the anticipated referral of patients to HHA Alpha. Below is an excerpt of the aforementioned exchange:

UCE:         That's absolutely fine so tell you what, why don't we do this um just as a bonus for-for uh another thousand dollars.

9

| TAYLOR: | I'll get as many as I can. |
|---|---|
| UCE: | Uh so let, let me emphasize this, we are the, we do not wanna be the company that you're like oh I owe them this I owe this. |
| TAYLOR: | Right, right. |
| UCE: | That's not us. |
| TAYLOR: | Right. |

28.     At the conclusion of the meeting, the UCE contacted CW-1 on his/her cellular phone. The UCE placed the call on speaker in order to introduce TAYLOR to CW-1. From their conversation, TAYLOR understood CW-1 would be the point of contact for HHA Alpha regarding any patient referrals sent to the company.

29.     During a recorded call with TAYLOR on November 3, 2017, the CW-1 advised that a patient referred by TAYLOR, was directed to another HHA by an employee at the facility where the patient was staying. TAYLOR offered to re-direct the patient to HHA Alpha by delaying the paperwork. Below is an excerpt of the aforementioned exchange:

| TAYLOR: | Well I've never heard of them and, and... |
|---|---|
| CW-1 | Yeah. |
| TAYLOR: | ...I'm gonna just like drag my feet, they're gonna need a signature from me. |
| CW-1 | Yeah. |
| TAYLOR: | And I'll tell them where'd you come from, I ordered someone else and see what they say. |

30.     During another recorded call with CW-1 on November 6, 2017, TAYLOR discussed how he would use his influence to steer patients to HHA Alpha. Below is an excerpt of the aforementioned exchange:

| TAYLOR: | Let, let me check.  I told him they're trying to have this other company...I'm telling him to cancel that one and go with you. |
|---|---|
| CW-1 | Okay. |

10

| TAYLOR: | (Talking to an unknown female ("UF") in background) What number? I'll have to, I have…what number are you? |
| UF: | Okay. Um alright, Well we'll see… |
| TAYLOR: | Tell him, tell him [the patient] I'm gonna have [HHA Alpha]. |
| UF: | (Talking to the patient) Okay, we'll have, we'll have [HHA Alpha] Dr. Taylor recommended, give you a call. Alright. Okay. Thank you. You too. Here's the patient's number… |

31.     During a second meeting with the UCE on December 6, 2017, TAYLOR discussed the difficulties in referring patients to HHA Alpha. TAYLOR agreed the case managers were likely re-routing patients from HHA Alpha to HHAs paying the case managers kickbacks. The UCE asked TAYLOR if he was comfortable continuing with their arrangement. TAYLOR agreed to continue and accepted $2,000 cash from the UCE for continued patient referrals to HHA Alpha. Below is an excerpt of the aforementioned exchange:

| UCE: | We-we found that this is a problem way more than Alta Bates and Summit it's uh it's um it's funny how many doctors are, are complaining because case managers are like behind their back or doing whatever to just… |
| TAYLOR: | Yeah they oh they ignore my order I have to call [HHA Alpha] and they didn't call them and they're not going to. |
| UCE | Yeah no uh we-we definitely know that uh there are competing uh interests and it's-it's-it's a definitely an uphill fight yeah but we. |
| TAYLOR: | That's why I call [CW-1] directly and. |
| UCE: | Put yeah and perfect, perfect I appreciate that, that is uh that is perfect um we really uh I hope you're happy with the way things are going and you. |
| TAYLOR: | Yeah s-so far so good. |
| UCE: | Excellent. |
| TAYLOR: | Yeah. |
| UCE: | Excellent. |
| TAYLOR: | Think it's good. |

| | | |
|---|---|---|
| UCE: | | Alright um would you like to keep it at the same level? |
| TAYLOR: | | Yeah I think that's fine. |
| UCE: | | Uh like one two, two months – |
| TAYLOR: | | Yeah. |
| UCE: | | Okay perfect.  Uh thousand? |
| TAYLOR: | | Yeah that's good |
| UCE: | | Thank you very much. |
| TAYLOR: | | Thousand is differ level, it's not two it's not up to two thousand. |
| UCE: | | Well so that's, that's my question uh it's certainly, certainly oh so like when we spoke last time we were talking about two patients at roughly a thousand uh four to five somewhere in the neighborhood of two thousand and then uh. |
| TAYLOR: | | Yeah I think two thousand is good. |

32.    At the conclusion of the meeting and after receiving the kickback payment, TAYLOR asked the UCE what type of patients s/he preferred be sent to HHA Alpha based on the patients' insurance provider. Below is an excerpt of the aforementioned exchange:

| | | |
|---|---|---|
| UCE: | | I appreciate that no I it-it you know I unfortunately obviously you know Medicare pays best but we need to mix it in unfortunately some insurance is so they pay us like less than the amount to even send one person out. |
| TAYLOR: | | That, that's my next question is which, which beside Medicare what else were you looking for?  What other insurances? |
| UCE: | | Um so actually uh let me, let me make sure oh [CW-1] did not give you that list?  Okay. |
| TAYLOR: | | If he did, he might have but I don't have it with me right now. |
| UCE: | | Okay uh let me…[CW-1] just responded. |
| TAYLOR: | | I just usually call and-and ask him and say can you take this one can you take that one? |
| UCE: | | Yeah. |

> TAYLOR:    But what I what I need is a list of what does he not want. That's
> probably the better question. And I would send him everything that not
> on the list. And you really get people that pay cash I guess that's kind of
> the point.

33.    During the course of the UCO, TAYLOR accepted $4,000 cash from the UCE and

referred at least 5 patients to HHA Alpha, including two Medicare beneficiaries.

## III.    PROBABLE CAUSE FOR THE VIOLATION

### A.    TITLE 42 UNITED STATES CODE, SECTION 1320A-7B(B)(1)(A), THE ANTI-KICK BACK STATUTE

34.    Title 42 United States Code, Section 1320a-7b(b)(1)(A), in relevant part, makes it a crime

to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate)

directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an

individual to a person for the furnishing or arranging for the furnishing of any service for which payment

may be made in whole or in part under a Federal health care program.

35.    Based on all of the foregoing, probable cause exists to believe that TAYLOR accepted

kickback payments from UCE that were intended to induce TAYLOR to send patient referrals to HHA

Alpha for home health and/or hospice services later billed to Medicare.

36.    Medicare is a federally funded health care program, and the referral of patients to HHA

Alpha by TAYLOR for home health and/or hospice services constitutes a referral, as defined by Title 42

United States Code, Section 1320a-7b(b)(1)(A).

37.    Therefore, there is probable cause to believe that patient referrals sent to HHA Alpha by

TAYLOR in exchange for cash payments from UCE meets the definition of a kickback payment and

violates anti-kickback statute.

## IV.    CONCLUSION

38.    Based on the foregoing, there is probable cause to believe TAYLOR conspired to receive

kickbacks in exchange for patient referrals, in violation of 42 U.S.C. § 1320a-7b(b)(1)(A).

## V.    REQUEST FOR SEALING

13

39.     Since this investigation is ongoing, disclosure of the Complaint, this affidavit, and/or this application and the attachments thereto will jeopardize the progress of the investigation.  Disclosure could result in the destruction of evidence, intimidation or collusion of witnesses, or the flight of a suspect. Accordingly, I respectfully request the Court issue an order directing this Affidavit and any related documents be sealed until the further order of this Court.

Janette Spring, Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me

this 3rd day of September, 2019.

HON. JOSEPH C. SPERO
United States Chief Magistrate Judge

14